**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRAVELERS PROPERTY** | ) | |
| **CASUALTY CO. OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 22-cv-2308** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **BENCHMARK INSURANCE CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case involves a dispute between two insurers (Travelers Property Casualty Co. of America and Benchmark Insurance Co.) as to which insurer is primarily responsible for the coverage in an underlying negligence lawsuit. On January 28, 2019, Brian Haro was leaving his employer's offices in Elk Grove Village, Illinois, when he slipped and fell on ice and suffered severe and permanent injuries. Haro subsequently brought suit in the Circuit Court of Cook County, Illinois, against the owner of the office complex, Rogers Industrial Park ("Rogers"), and Rogers's agent and property manager, Arthur J. Rogers & Co. ("AJR"). Haro alleges that Rogers and AJR were negligent in maintaining the property and that their negligence led to Haro's fall and subsequent injuries. Plaintiff here, Travelers Property Casualty Company of America ("Travelers"), issued a commercial general liability policy to AJR. Defendant Benchmark Insurance Company ("Benchmark") issued a liability insurance policy to Haro's employer, Helget Gas Products, Inc. ("Helget"). The Benchmark policy also names AJR as an additional insured.

Travelers initiated this lawsuit seeking a declaratory judgment that – under the terms of the relevant insurance policies and the lease agreement between Helget and AJR – Benchmark is

1

primarily responsible for the defense and indemnity of AJR in the Haro suit, and that Travelers'
policy provides only excess coverage.  Travelers also seeks contractual and equitable
subrogation for the defense costs it has already expended.  Benchmark responded to the
complaint with an answer and counterclaim seeking essentially the opposite declaratory
judgment, that is, a declaration that Travelers is the primary insurer for AJR and Benchmark
provides only excess coverage with respect to the Haro suit.

Currently before the Court are multiple motions regarding the parties' conflicting claims.
Specifically, Travelers has filed a motion to dismiss Benchmark's counterclaim pursuant to
Federal Rule of Civil Procedure 12(b)(6), (Dckt. #10), and a motion for judgment on the
pleadings pursuant to Rule 12(c), (Dckt. #12).  Benchmark filed a response to Travelers' motion
for judgment on the pleadings, in which it also included a cross-motion for summary judgment
on its counterclaim under Rule 56(a), (Dckt. #17).

For the reasons stated below, the Court finds that: (1) Travelers is entitled to a declaratory
judgment that its coverage for AJR is excess and Benchmark is primarily responsible for the
defense and indemnity of AJR in the underlying Haro suit; (2) although Travelers is entitled to
contractual subrogation, its claim for a judgment in the amount of the costs it has expended to
date in defense of AJR in the Haro suit and for any future defense costs and/or indemnity
payments is premature because Illinois law does not permit partial subrogation; and (3) Travelers
cannot state a claim for equitable subrogation in light of the express contractual subrogation
provisions.  Accordingly, Travelers' motion for judgment on the pleadings is granted in part as to
its claim for a declaratory judgment in Count I but is denied as to its claims for contractual
subrogation in Count II and equitable subrogation in Count III.  In light of these rulings,
Benchmark's cross-motion for summary judgment is denied, and Travelers' motion to dismiss

Benchmark's counterclaim is granted.

## I.    BACKGROUND

The following factual background is largely taken from the undisputed allegations in Travelers' Complaint, (Dckt. #1), as well as from the terms of the relevant insurance policies and lease agreement, all of which are attached to the Complaint and therefore incorporated into the pleading for all purposes. *See* Fed.R.Civ.P. 10(c); (Dckt. ##1-2, 1-3, 1-4). Additionally, consistent with Northern District of Illinois Local Rule 56.1, Benchmark has included with its cross-motion for summary judgment a statement of undisputed material facts, though the Court observes that most of the purported "additional" facts in Benchmark's statement merely reiterate information that already appears in the Complaint or its attachments. (Dckt. #18). In any event, the Court will note below the additional facts contained in Benchmark's statement to the extent they add any additional facts that do not already appear in the pleadings. And of course, the Court will note any disputes of fact as is necessary.[1]

### A.   The Haro Lawsuit.

On February 21, 2020, Brian Haro filed suit against Rogers in the Circuit Court of Cook County, Case No. 20 L 002190 (the "Haro Lawsuit"). (Dckt. #9 ¶5).[2] On September 18, 2020,

---

[1] Benchmark repeatedly disputes factual assertions in the Complaint in which Travelers merely recites language from the relevant policies and lease attached to the Complaint. The quotations all appear to be accurate, however, and Benchmark has admitted the validity of the agreements. It seems Benchmark has simply taken issue with how Travelers has excerpted portions of the cited provisions instead of presenting full unabridged quotations. But, as the agreements are all attached to the pleadings and incorporated in their entirety, the Court is not limited by how either party has presented the terms; rather, the terms themselves are incorporated into the Complaint in full. The Court will therefore not note every time Benchmark has raised this dispute, but will quote the relevant language from the agreements as is necessary to resolve the instant motions.

[2] The Court cites to Benchmark's answer, (Dckt. #9), where both the allegation and Benchmark's response are set forth in the same document. For any facts from Benchmark's Rule 56.1 statement, the Court cites to Travelers' response, (Dckt. #24), where both the asserted fact and Travelers' response are set forth in the same document.

3

Haro filed a Second Amended Complaint (the "Haro Complaint") adding AJR as a defendant. (*Id.* ¶7; Dckt. #1-1).[3]

Count I of the Haro Complaint alleges that Rogers owned, operated, controlled, maintained, and managed a building and surrounding property located at 2711 Coyle Ave., Elk Grove Village, Illinois (the "Building"). (Dckt. #9 ¶8). The Haro Complaint further alleges that a dangerous and defective condition in the drainage system at the Building caused an unnatural accumulation of snow and ice, leading the entrances and exits surrounding the Building to be in a dangerous condition about which Rogers knew or reasonably should have known. (*Id.* ¶¶9–12). Haro alleges that he was attempting to exit the building on January 28, 2019, when he slipped and fell on the ice and sustained injuries. (*Id.* ¶13). In Count I, Haro asserts a claim that Rogers was negligent in its duties of operating and maintaining the Building, and that its negligence was the direct and proximate cause of Haro's injuries. (*Id.* ¶¶14–15).

Count II of the Haro Complaint alleges a cause of action for negligence against AJR based on substantially the same allegations as those asserted against Rogers in Count I. (*Id.* ¶19). Relevant here, the Haro Complaint alleges that AJR "maintained, operated, managed and supervised Rogers Industrial Park, including the Building, surrounding property and a parking lot." (*Id.*; Dckt. #1-1 at 3, ¶3).

On May 24, 2021, Rogers and AJR filed a third-party complaint in the Haro Lawsuit naming as third-party defendants Helget; Beverly Snow & Ice, Inc.; and Mario J. Landscaping, Inc. (Dckt. #24 ¶19; Dckt. #18-1). The third-party complaint alleges that these third-party defendants, including Helget, were guilty of negligent acts or omissions that caused or contributed to Haro's injuries. (Dckt. #18-1). Rogers and AJR are the only parties in the Haro

---

[3] The Haro Complaint also includes claims against an additional defendant, Yolanda Alvarado, but those claims appear to arise from a separate incident not relevant to the case here.

4

Lawsuit who have alleged negligence against Haro's employer Helget with respect to Haro's injuries. (Dckt. #24 ¶11).[4]

### B. The Lease Agreement Between Helget and AJR

At the time of the incident alleged in the Haro Complaint, Haro was in the course of his employment with Helget. (Dckt. #9 ¶21). Helget was party to a lease agreement ("Lease") with AJR, acting as agent for Rogers. (*Id.* ¶22). Rogers owned the property that was the subject of the Lease, which included the Building described above, and AJR served as the landlord and property manager. (*Id.* ¶¶23–25). The Lease was in effect at all times relevant to this lawsuit and the underlying Haro Lawsuit, and provides that Helget will occupy the premises for its wholesale medical gas sale and distribution business. (*Id.* ¶26; *see* Dckt. #1-2 at 7).

The Lease contains an "Insurance and Indemnification" provision which requires Helget, as the tenant, to maintain an insurance policy providing certain coverage to AJR, as the landlord. Specifically, the Lease provides that:

> Tenant shall procure from companies satisfactory to Landlord and maintain during the term of this Lease, at its own cost and expense, a policy or policies of insurance insuring Landlord and Tenant, as their respective interests may appear, against Public Liability and Property Damage occurring on Leased Premises or by reason of the use and operation thereof, which policy or policies of insurance shall:
>
> a) insurance coverage against any and all liability whatsoever and howsoever occasioned by reason of injury to persons in the amount of $1,000,000 per accident or occurrence . . . .

(Dckt. #9 ¶28; Dckt. #1-2 at 11). The Lease also contains a provision requiring Helget to indemnify and hold harmless AJR for any claims or litigation arising out of any occurrence at the

---

[4] Travelers' response to Benchmark's Rule 56.1 statement states that it "denies" this assertion. But Travelers does not explain the basis for its denial, nor point to any evidence disputing the fact. The Court therefore deems the fact admitted. N.D.Ill. R. 56.1(e)(3) (noting that in order to dispute an asserted fact, a party must cite evidence explaining the basis for the dispute and explain how the evidence contravenes the asserted fact).

Building occasioned by Helget's use of the property, except that the indemnification provision does not apply when the events underlying the claims or litigation were caused by AJR's own negligence. (*See* Dckt. #24 ¶6; Dckt. #1-2 at 29). Also relevant here is that the Lease provides that AJR shall keep the Building and common areas of the premises in "good condition and repair," though Helget is responsible for its "proportionate share" of the common area expenses, which includes items such as snow removal. (Dckt. #1-2 at 4, 8).

### C. The Benchmark Insurance Policy

Benchmark issued a liability insurance policy to Helget, with an effective period of July 1, 2018, to July 1, 2019 (the "Benchmark Policy"). (Dckt. #9 ¶29; Dckt. #1-3). The Benchmark Policy lists Helget as the Named Insured, and includes the following relevant definitions on the first page:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.
>
> The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

(Dckt. #1-3 at 2, 8). The Insurance Agreement under Coverage A of the Benchmark Policy provides that Benchmark will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies. [Benchmark] will have the right and duty to defend the insured against any 'suit' seeking those damages." (Dckt. #9 ¶31; Dckt. #1-3 at 8).

The Benchmark Policy includes an "Additional Insured-Managers or Lessors of Premises" endorsement ("AI-Managers Endorsement"), which provides a Schedule identifying "Arthur J. Rogers & Co." [AJR] as an additional insured. (Dckt. #9 ¶31; Dckt. #1-3 at 90). The AI-Managers Endorsement also includes language modifying the Benchmark Policy to include

6

"as an additional insured . . . the Organization(s) shown in the Schedule, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you [Helget] and shown in the Schedule." (Dckt. #9 ¶35; Dckt. #1-3 at 90).

Condition 4 of the Benchmark Policy includes an "Other Insurance" clause, which provides as follows:

> If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:
>
> ### a. Primary Insurance
>
> > This insurance is primary except when Paragraph b below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

(Dckt. #9 ¶32; Dckt. #1-3 at 19).

Paragraph b, "Excess Insurance," provides that the Benchmark Policy is excess over a number of categories of other types of insurance or types of losses, including: (1) "Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage" for Helget's work; (2) "Fire Insurance for premises rented to [Helget]"; (3) insurance purchased by Helget to cover its liability as a tenant for "property damage" to the premises rented to it; (4) losses arising out of the maintenance or use of aircrafts, automobiles, or watercraft to the extent not otherwise covered by the Benchmark Policy; and (5) "any other primary insurance available to 'you' covering liability for damages arising out of the premises or operations . . . for which you have been added as an additional insured." (*Id.*). Paragraph c provides the methods by which Benchmark will share and contribute coverage in the event other primary insurance covers the same loss. (*Id.*).

The Benchmark Policy is also endorsed with a "Primary and Noncontributory- Other Insurance Condition" endorsement (hereafter, the "PNC Endorsement"), which provides as follows:

> The following is added to the Other Insurance Condition and supersedes any provision to the contrary:
>
> **Primary and Noncontributory Insurance**
>
> This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under your policy provided that:
>
> (1) The additional insured is a Named Insured under such other insurance; and
>
> (2) You have agreed in writing in a contract or agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

(Dckt. # 9 ¶35; Dckt. #1-3 at 75).

### D. The Travelers Insurance Policy.

Travelers issued AJR a policy including commercial general liability coverage, effective from September 30, 2018, to September 30, 2019 (the "Travelers Policy"). The policy includes coverage for the Building and surrounding premises located in Elk Grove Village, Illinois. (Dckt. #1-4 at 8). The Travelers Policy contains language identical to the Benchmark Policy above with respect to the relevant definitions of "you," "your," and "insured," and the relevant portions of the Insuring Agreement under Coverage A of the Travelers Policy is identical to the same provision under the Benchmark Policy. (Dckt. #9 ¶37; Dckt. #1-4 at 20).

Like the Benchmark Policy, the Travelers Policy includes an "Other Insurance" clause that provides as follows:

> If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

***

**b. Excess Insurance**

This insurance is excess over:

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any of other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance . . .

(Dckt. #9 ¶38; Dckt. #1-4 at 30-31). The Travelers Policy further provides that if AJR has rights to recover any payments made under the provisions of the policy, those rights are transferred to Travelers. (*Id.*).

The Travelers Policy is additionally endorsed with a "Real Estate Property Managed" endorsement, which provides in relevant part that:

With respect to your liability arising out of your management of property for which you are acting as a real estate manager this insurance is excess over any other valid and collectible insurance available to you.

(Dckt. #9 ¶39; Dckt. #1-4 at 59).

**E. Travelers' Tender of the Haro Lawsuit, and the Procedural History of this Federal Lawsuit.**

As noted above, the Haro Lawsuit was filed in February 2020 and initially only named Rogers as a defendant. Travelers appears to have insured both Rogers and AJR, and on July 9, 2020, a Travelers claim handler sent a letter to Helget tendering the defense of Rogers in the

Haro Lawsuit to Helget's insurer pursuant to the Lease. (Dckt. #9 ¶¶40-41). On August 25, 2020, an attorney acting as claims counsel on behalf of Benchmark responded to the tender and denied that the indemnification terms of the lease required Helget to indemnify Rogers for the claims in the Haro Lawsuit. (*Id.* ¶¶42-43).[5] Over the next few months, Benchmark's claim counsel and Travelers' claims handler continued to exchange communications regarding Travelers' tender and whether the Lease agreement indemnification provision applied. (*Id.* ¶¶44-47).

After AJR was added as a defendant in the Haro Lawsuit in September 2020, Travelers' claims handler sent a further inquiry about the tender, and noted that the Benchmark Policy included an endorsement adding AJR as an additional insured under the policy. (*Id.* ¶46). Benchmark's coverage counsel initially denied that the policy offered any coverage to AJR in light of certain other exclusions in the Benchmark Policy not relevant here. (*Id.* ¶¶47-49). Eventually, however, in February 2021, Benchmark's claims counsel abandoned the exclusion issue and sent a communication to Travelers acknowledging that AJR qualified as additional insured under the Benchmark Policy and was entitled to defense and indemnity for the Haro Lawsuit. (*Id.* ¶50). However, while Benchmark's claims counsel acknowledged that coverage existed, they went on to assert that the respective "other insurance" clauses in the Travelers Policy and Benchmark Policy rendered Travelers the primary insurer with the primary duty to defend AJR, and that Benchmark owed AJR only excess coverage, with no duty to defend and

---

[5] The Complaint states that Travelers' tender for defense was actually sent to Helget and "Gallagher Insurance," and that the claims counsel who responded stated that they represented "VGM Insurance Services," which purported to have a liability policy in effect for Helget. (Dckt. #9 ¶¶41-42). The parties' various pleadings and filings in connection with the present motions never explain the relationship among Gallagher, VGM, and Benchmark. Ultimately, however, Benchmark admits that the claims counsel who responded to Travelers had authority to speak on behalf of Benchmark, and that it was Benchmark who issued the relevant policy to Helget. Therefore, the identity of the other corporate entities involved in the tender communications appears to be irrelevant.

indemnify AJR until Travelers exhausted its limits under its policy. (*Id.*). In light of Benchmark's position that it was excess, it refused to defend AJR in the Haro Lawsuit, which required Travelers to step in to cover AJR's defense and pay its attorney's fees and legal expenses. (*Id.* ¶50).

Travelers filed the instant lawsuit on May 3, 2022, seeking a declaratory judgment that – under the terms of the Lease and the two insurance policies – the Benchmark Policy provides primary and non-contributory insurance to AJR in relation to the Haro Lawsuit, and the Travelers Policy provides excess-only insurance, meaning that Travelers owes no duty to defend or indemnify AJR in relation to the Haro Lawsuit unless and until the Benchmark Policy has been exhausted. (Dckt. #1 ¶55). Travelers also seeks equitable and contractual subrogation for the sums it has already expended to defend AJR in the Haro Lawsuit ("approximately $25,000" at the time the Complaint was filed), as well as any further expenses incurred in the defense and/or indemnity of AJR for the Haro Lawsuit going forward. (*Id.* ¶¶60-68).

On June 29, 2022, Benchmark responded to the Complaint with an Answer generally denying Travelers' claims, and asserting a counterclaim that mirrors the declaratory relief requested by Travelers. (Dckt. #9 at 20-25). Specifically, Benchmark seeks a declaratory judgment that the Benchmark Policy provides only excess coverage to AJR and the Travelers Policy provides primary coverage, meaning Benchmark need not provide coverage to AJR until Travelers has exhausted its policy limits.

After Benchmark filed its Answer, Travelers responded with a motion to dismiss Benchmark's counterclaim, (Dckt. #10), as well as a motion for judgment on the pleadings in Travelers' favor on its claims for declaratory judgment and contractual and equitable subrogation, (Dckt. #12). Benchmark responded to the motion for judgment on the pleadings

with its own cross-motion for summary judgment on its counterclaim, (Dckt. #17). After the motions were fully briefed, the Court granted Travelers leave on two occasions to file supplemental briefs to add citations to additional cases decided after briefing had closed. (Dckt. ##33, 37, 39, 47, 51). The Court also granted Benchmark leave to respond to Travelers' supplemental authority. (Dckt. ##38, 52).

## II.    LEGAL STANDARD

Travelers' motion for judgment on the pleadings is brought pursuant to Rule 12(c), which allows for such motions after the pleadings are closed. Fed.R.Civ.P. 12(c). "A motion for judgment on the pleadings may be granted only if the moving party clearly establishes that no material issue of fact remains to be resolved and that he or she is entitled to judgment as a matter of law." *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987). Benchmark's cross-motion for summary judgment is brought under Rule 56(a), which similarly allows the Court to grant summary judgment if the movant shows that that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The main difference between the standards governing Travelers' Rule 12(c) motion and Benchmark's Rule 56(a) motion is the materials the Court may consider. In particular, Travelers must establish that it is entitled to judgment based on the undisputed facts in the pleadings themselves and any incorporated attachments, whereas Benchmark must support its motion by pointing to evidence outside the pleadings, such as materials from discovery, admissions by the parties, or affidavits. *See* Fed.R.Civ.P. 56(c).

Travelers' motion to dismiss Benchmark's counterclaim is brought pursuant to Rule 12(b)(6). Under that rule, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To survive a Rule 12(b)(6) motion, a

complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Intercon Sols., Inc. v. Basel Action Network*, 969 F.Supp.2d 1026, 1067 (N.D.Ill. 2013), *aff'd*, 791 F.3d 729 (7th Cir. 2015) (citing *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001)). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss under Rule 12(b)(6), the Court construes "the complaint in the light most favorable to the [non-moving party] accepting as true all well-pleaded facts and drawing reasonable inferences in [the non-moving party's] favor." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). However, the Court "need not accept as true statements of law or unsupported conclusory factual allegations." *Id*.

## III. DISCUSSION

Although the parties have filed three separate motions under three different Federal Rules of Civil Procedure – each with its own standards for review – all three motions turn on the same two central legal questions, namely: (1) which insurer, either Travelers or Benchmark, is primarily responsible for the defense and indemnity of AJR with respect to the Haro Lawsuit, and (2) which insurer provides only excess coverage that is not triggered until the primary insurance is exhausted. Answering these questions requires the Court to interpret the relevant terms of the Lease, the Benchmark Policy, and the Travelers Policy, all of which are attached and incorporated into the Complaint. A decision for either insurer on these questions will

necessarily resolve all three motions.[6]  For example, a finding that the Travelers Policy is excess necessarily means that Benchmark's counterclaim fails as a matter of law, and the Court must grant the motion to dismiss the counterclaim and deny the cross-motion for summary judgment. The Court will therefore frame its discussion based on the parties' respective arguments on this central issue.

For the reasons stated below, the Court finds that the Travelers Policy is excess to the Benchmark Policy, and that Travelers need only provide for the defense and indemnity of AJR after Benchmark's limits are exhausted.  Judgment on the pleadings in Travelers' favor on its claim for a declaratory judgment in Count I is therefore appropriate as a matter of law. Furthermore, although Travelers is entitled to contractual subrogation, its claim for judgment in the amount of the costs that it has incurred and will incur in the future in defense of AJR in the Haro case is premature.

### A. Illinois law governs this dispute.

Before addressing the merits of the dispute, the Court will first briefly summarize the applicable law governing its analysis.  Notably, none of the relevant insurance policies or the Lease agreement appears to have a choice-of-law provision.  This case is before the Court on

---

[6] The priority-of-coverage issue is the only question before the Court because Benchmark does not dispute that AJR is covered as an additional insured under the Benchmark Policy, or that both Travelers and Benchmark are obligated to defend and indemnify AJR in relation to the Haro lawsuit.  (*See, e.g.*, Dckt. #9 ¶¶50–51).  Even if there were such a dispute, however, the Court would find that the Haro Complaint triggers coverage for AJR under the Benchmark Policy as a matter of law.  The Benchmark AI-Managers Endorsement provides that AJR is an additional insured under the Benchmark Policy for "liability arising out of the ownership, maintenance or use of that part of the premises leased to [Helget]." (*Id*. ¶35; Dckt. #1-3 at 90).  The Haro Complaint alleges that Haro was injured in the course of his employment while attempting to exit the premises leased to Helget.  Therefore, Haro's injuries, and AJR's alleged liability to Haro, arise out of the "use" of the premises leased to Helget.  Benchmark's AI-Managers Endorsement thus applies to make AJR an insured under the Benchmark Policy, and the policy provides that Benchmark will defend and indemnify AJR for claims due to "bodily injury," as Haro has alleged in the underlying suit.

diversity jurisdiction,[7] and in the absence of any choice-of-law provisions to the contrary, the

Court is to apply the substantive law of the forum state, here Illinois. *See Davis v. G.N. Mortg.*

*Corp.*, 396 F.3d 869, 876 (7th Cir. 2005).

Benchmark suggests that, because its policy to Helget was issued from its offices in

Nebraska, Nebraska law *may* also apply. Benchmark looks to Nebraska's choice-of-law

principles, and argues that those principles support the application of Nebraska law to this

dispute, though it concedes in the very next breath that Illinois law may also be appropriate

under the same analysis. (Dckt. #19 at 5-7). But Benchmark is mistaken in its view that the

Court should consider applying Nebraska law. Again, as this Court is sitting in diversity, it

applies the choice-of-law rules of the forum state, Illinois. *See Kohler v. Leslie Hindman, Inc.*,

80 F.3d 1181, 1184 (7th Cir. 1996). "Illinois courts engage in a choice-of-law analysis *only if*

*there is a conflict* between Illinois law and the law of another state such that 'a difference in law

will make a difference in the outcome.'" *W. Side Salvage, Inc. v. RSUI Indem. Co*., 878 F.3d

219, 223 (7th Cir. 2017) (emphasis added). While Benchmark suggests Nebraska law might

apply, it also concedes that the Court's analysis would be substantially the same under either

state's law for insurance contract interpretation. In other words, Benchmark has pointed to no

conflict between the laws of the two states that would make any difference in the outcome of this

---

[7] The parties are citizens of different states. As to the amount-in-controversy requirement, Travelers'
Complaint indicates that its damages are only approximately $25,000.00 as of the filing of the Complaint.
But Travelers seeks a declaratory judgment regarding its obligations to defend and indemnify AJR in the
Haro Lawsuit, and therefore the *potential* costs of the defense and ultimate indemnification count toward
the amount in controversy. *See Twin City Fire Ins. Co. v. Law Off. of John S. Xydakis, P.C*., No. 18-CV-
6387, 2021 WL 1192689, at *1 (N.D.Ill. Mar. 30, 2021) (collecting cases); *see also Midland Mgmt. Co. v.
Am. Alt. Ins. Corp.*, 132 F. Supp. 3d 1014, 1020 (N.D.Ill. 2015) ("Whether the insurer must foot the bill
for defense and liability in the underlying suit is the essence of the coverage dispute, so of course [both
defense and indemnity] count[].").  The Haro Complaint indicates that Haro seeks at least $50,000.00 in
damages from AJR, which Travelers could potentially be liable for if it is found to be the primary carrier
and Benchmark the excess carrier.  Between the potential indemnification costs in excess of $50,000.00,
and defense costs of at least $25,000.00, the amount in controversy exceeds $75,000.00. !

case.  In the absence of any conflict, the Court need not engage in any choice-of-law analysis at all, and instead simply applies Illinois law, the law of the forum state.

"Under Illinois law, '[a]n insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies.'" *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777 (7th Cir. 2015), *quoting Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (2005)).  As with any contract, "an insurance policy is construed according to the plain and ordinary meaning of its unambiguous terms." *Auto–Owners Ins. Co. v. Munroe*, 614 F.3d 322, 324 (7th Cir. 2010) (citing *Nicor, Inc. v. Associated Elec. & Gas*, 860 N.E.2d 280, 286 (Ill. 2006)).  Ultimately, the Court's "primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Westfield Ins. Co.*, 796 F.3d at 777 (citation omitted).  To do so, the Court must "construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster Managers Corp. v. Resolution Tr. Corp.*, 620 N.E.2d 1073, 1078 (Ill. 1993).

**B. Travelers' policy is excess to the Benchmark Policy.**

Travelers advances three distinct reasons as to why the Benchmark Policy provides primary insurance to AJR and the Travelers Policy provides excess insurance: (1) the terms of the Lease requiring Helget to provide insurance to AJR, read in conjunction with Benchmark's PNC Endorsement, render the Travelers Policy excess; (2) the respective "other insurance" clauses of the Travelers Policy and Benchmark Policy renders the Travelers Policy excess to the Benchmark Policy; and (3) the "Real Estate Property Managed" endorsement of the Travelers Policy renders it excess to the Benchmark Policy.  (Dckt. #13 at 2).  Notably, Travelers need not

prevail on all three of its assertions and, indeed, prevailing on even one of them will result in a ruling in its favor. The Court will address each argument in turn.

    1. <u>The PNC Endorsement does not apply in the circumstances here.</u>

As to Travelers' first contention – on which Benchmark appears to almost exclusively rely in support of its own position – Travelers argues that the interplay between the language in the Lease agreement and the PNC Endorsement in the Benchmark Policy render the Benchmark Policy primary and the Travelers Policy excess. As laid out in detail above, the Lease between Helget and AJR requires Helget to secure insurance covering AJR "against any and all liability whatsoever and howsoever occasioned by reason of injury to persons," (Dckt. #9 ¶28; Dckt. #1-2 at 11). The PNC Endorsement in the Benchmark Policy provides that the Benchmark Policy "is primary to and will not seek contribution from any other insurance available to an additional insured," provided that: (1) the additional insured is a Named Insured under that other insurance, and (2) Helget has agreed in writing that Benchmark's policy "would be primary and would not seek contribution from any other insurance available to the additional insured." (Dckt. #9 ¶35; Dckt. #1-3 at 75).

According to Travelers, the first condition under the PNC Endorsement is satisfied because AJR, the additional insured under the Benchmark Policy, is a Named Insured under the Travelers Policy, *i.e.*, the "other insurance" referenced by the endorsement. (Dckt. #13 at 12). As to the second condition, Travelers argues that the Lease qualifies as the requisite agreement in writing because Helget agreed under the terms of the Lease to secure insurance covering AJR against "any and all liability whatsoever and howsoever occasioned by reason of injury to persons." (*Id.*). Travelers thus argues that the terms of the PNC Endorsement apply and require a finding that the Benchmark Policy is primary for AJR, and that Benchmark will not seek any

contribution from any other insurance, *i.e.*, Travelers.  (*Id.*).  Benchmark counters that the written agreement requirement of the PNC Endorsement is *not* satisfied, because the Lease does not specifically state that the insurance Helget was to secure would be "primary or noncontributory." Benchmark maintains that the lack of those express terms in the Lease mean that the PNC Endorsement does not apply.  (Dckt. #19 at 3).

The Court agrees with Benchmark that the PNC Endorsement is not triggered here.  The unambiguous language of this provision requires Helget to have specifically agreed in writing that the insurance it was securing would be primary *and* that it would not seek contribution from any other insurance.  Helget's agreement in the Lease to secure insurance covering AJR against "any and all liability" does not use those words.  It is possible the Lease could be read as an agreement by Helget to at least secure primary insurance that covers AJR against all types of liability by reason of injury to persons, that is, insurance that provides immediate coverage and is not contingent on the exhaustion of another policy.  But the Lease is silent on whether the insurance secured by Helget is primary *and* whether it can, or cannot, seek contribution from any other insurers that may cover AJR.  In other words, Helget simply agreed to secure primary liability insurance for AJR – which it did through the Benchmark Policy – but Helget did *not* make a written agreement that Benchmark would be precluded from seeking contribution from any other policy that covered AJR, such as from Travelers.  The PNC Endorsement is thus not triggered and does not apply to determine the priority of coverage between Travelers and Benchmark.  In short, the endorsement does not compel a finding, on its own terms at least, that

Travelers is excess to Benchmark. [8]

Unfortunately for Benchmark, this is where the Court's agreement with its position ends. While the PNC Endorsement may itself not render the Travelers Policy excess to Benchmark, Travelers has offered two alternative grounds under the language of the policies as a basis for considering its coverage excess to Benchmark, and the Court agrees with Travelers as to each.

2. The "Other Insurance" clauses render Travelers excess to Benchmark.

Travelers' second argument relies on a comparison between the language in the "other insurance" provisions of the Benchmark and Travelers policies.  (Dckt. #13 at 12-13).  In Illinois, priority of coverage between two insurance policies is dictated by the terms of the "other insurance" clauses in the policies.  *Putman v. New Amsterdam Casualty Co.*, 48 Ill.2d 71, 76-77 (1970); *Navigators Ins. Co. v. N. Builders, Inc.*, 2013 IL App (1st) 122479-U, ¶ 22 (citing *Putnam*).  The Illinois Supreme Court has held that, whenever possible, "other insurance" clauses in competing policies should be reconciled to effectuate the intent of the parties.  *Id.* Travelers argues that by reading the provisions in tandem, it is clear that the Benchmark Policy is primary and Travelers is excess.  The Court agrees.

As detailed above, the Benchmark Policy states that it generally affords primary

---

[8] Travelers cites to a case from the Illinois Appellate Court for the proposition that the use of the explicit terms "primary and non-contributory" was not required in order to trigger the PNC Endorsement.  *See Bieda v. Carson Int'l*, 663 N.E.2d 102, 104–05 (Ill.App. 1996).  In that case, similar to here, a lease required a tenant to secure insurance covering its landlord against "all liabilities," and the tenant secured insurance from Liberty Mutual that named the landlord as an additional insured.  *Id.* at 104.  The landlord later brought suit against Liberty seeking a declaration of its rights under the policy, and Liberty argued, as Benchmark does, that it was not a primary insurer because the lease agreement did not specifically use the word "primary."  *Id.*  The court rejected that argument and found that the lease did not need to use the explicit word "primary" to render Liberty as such because the terms of the agreements read together made it apparent it was the parties' intent that Liberty would be primary.  *Id.* at 104-05.  The Court finds the case distinguishable, however, as the terms of the Liberty Mutual policy with respect to other insurance are different from the requirements under the PNC Endorsement.  For example, the Liberty policy did not contain an express provision requiring the tenant to specifically agree in writing that the policy would be primary and noncontributory.  The reasoning of the *Bieda* decision is therefore inapplicable to the circumstances here.

19

coverage, except that it is excess over five other categories of insurance and losses listed in

Paragraph b, "Excess Insurance": (1) "Fire, Extended Coverage, Builder's Risk, Installation

Risk, or similar coverage" for Helget's work; (2) "Fire Insurance for premises rented to

[Helget]"; (3) insurance purchased by Helget to cover its liability as a tenant for "property

damage" to the premises rented to it; (4) losses arising out of the maintenance or use of aircrafts,

automobiles, or watercraft to the extent not otherwise covered by the Benchmark Policy; and (5)

"any other primary insurance available to 'you' covering liability for damages arising out of the

premises or operations . . . for which you have been added as an additional insured." (Dckt. #9

¶32; Dckt. #1-3 at 19).

        The first four of these categories are plainly not at issue, as the Travelers Policy does not

provide any of the listed types of coverage for Helget's work (category 1); is not fire insurance

(category 2); is not insurance purchased by Helget (category 3); and the loss here did not arise

from the maintenance or use of aircrafts, automobiles, or watercraft (category 4). As to the fifth

category, "any other primary insurance available to 'you'": the Benchmark Policy defines the

term "you" to mean "the Named Insured shown in the Declarations, and any other person or

organization qualifying as a Named Insured under this policy." (Dckt #1-3 at 8). Helget is the

Named insured under the Benchmark Policy, and AJR is an *additional insured*, but is not the

Named Insured. Thus, this category in the Benchmark Policy, and the reference to "primary

insurance available to you," only refers to other primary insurance issued to *Helget*, and is not

implicated by the Travelers Policy issued to AJR. As none of the categories under Paragraph b

apply, Benchmark's insurance is primary, and its obligations to AJR are primary and are not

affected unless there is other *primary* insurance. (Dckt. # 9 ¶32; Dckt. #1-3 at 19).

        A review of the "other insurance" provisions in the Travelers Policy, on the other hand,

demonstrates that the Travelers Policy is not other primary insurance, but is excess to Benchmark. The Travelers Policy contains an "excess insurance" provision that is virtually identical to category five above from the Benchmark Policy. That is, the Travelers Policy states that Travelers is excess over "[a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement." (Dckt. #1-4 at 30). Just like the Benchmark Policy, "you" is defined in the Travelers Policy as the Named Insured, which – in the case of the Travelers Policy – is AJR.

The Travelers Policy is therefore excess over other primary insurance available to AJR, for which AJR has been added as an additional insured by attachment of an endorsement, and for which liability arises out of the premises or operations thereof. All of these conditions are met: the Benchmark Policy is primary insurance available to AJR, which has been added to the Benchmark Policy as an additional insured via endorsement, and AJR's potential liability for damages arises out of the use or operations of the premises at issue in both policies: namely, the Building in Elk Grove Village, Illinois. Therefore, in reading the two other insurance clauses in tandem, the Travelers Policy is excess to Benchmark, which is other primary insurance issued to AJR. *See, e.g.*, *Certain Underwriters at Lloyd's London v. Burlington Ins. Co.*, 37 N.E.3d 303, 309 (Ill.App. 2015) (reaching the same conclusion in a dispute between insurers involving "other insurance" clauses virtually identical to the ones here); *see also Am. Fire & Cas. Co. v. Am. Fam. Home Ins. Co.*, No. CV 21-7668 (RBK/MJS), 2023 WL 3580836, at *11 (D.N.J. May 22, 2023).

Benchmark does not provide any direct or otherwise persuasive argument on the application of the other insurance clauses discussed above, therefore waiving any argument as to

the interpretation and application of the provisions. *See Ennin v. CNH Indus. Am., LLC*, 878

F.3d 590, 595 (7th Cir. 2017) (noting that "[f]ailure to respond to an argument generally results

in waiver"); *see also Cincinnati Ins. Co. v. E. Atl. Ins. Co*., 260 F.3d 742, 747 (7th Cir. 2001)

(recognizing that when a party fails to respond to a non-frivolous dispositive argument, it

"acquiesces, rightly or wrongly" to that argument).  Benchmark does assert as a general matter

that, if the PNC Endorsement discussed above does not apply, then the Benchmark Policy must

be excess.  (Dckt. #19 at 8-9).  But this conclusory argument is stated without any explanation or

citation to legal authority, and could itself be considered waived.  *See Kalis v. Colgate–*

*Palmolive Co*., 231 F.3d 1049, 1057 n.5 (7th Cir. 2000) ("We repeatedly have made clear that

perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent

authority, are waived.") (citation omitted).

      Regardless, to the extent that Benchmark is attempting to suggest that the terms of the

PNC Endorsement somehow override or render void the "other insurance" provisions in the

Benchmark Policy, that argument is without merit.  It is true the PNC Endorsement states that it

"supersedes" any provisions to the contrary contained in the "other insurance" clauses.  (Dckt. #9

¶35; Dckt. #1-3 at 75).  But, as already discussed above in Section III.B.1. the PNC Endorsement

does not apply to the circumstances here at all, because Helget did not agree in writing to provide

AJR with primary and noncontributory insurance.  In other words, there is nothing contrary

between the provisions in these circumstances, because the PNC Endorsement does not apply.  *If*

Helget had agreed in writing that Benchmark's policy would be primary and noncontributory

over all other insurance, that would trigger the PNC Endorsement and render it controlling over

any contrary provisions in the other insurance clauses.  But since the provision is not triggered at

all, there is nothing to supersede, and the remaining other insurance provisions discussed above

control.  Those provisions render Benchmark as a primary insurer, and the provisions in the
Travelers Policy render it excess.

3.  The "Real Estate Property Managed" Endorsement renders the Travelers Policy excess.

The "other insurance" clauses discussed above in Section III.B.2. render Benchmark as
primary and Travelers as excess.  Additionally, Travelers is correct in its third argument that the
"Real Estate Property Managed" endorsement in the Travelers Policy likewise operates to render
Travelers as excess only.  The Travelers' endorsement states: "With respect to your liability
arising out of your management of property for which you are acting as a real estate manager this
insurance is excess over any other valid and collectible insurance available to you."  (Dckt. #9
¶39; Dckt. #1-4 at 59).  The Haro Complaint includes claims against AJR based on its
management and operation of the Building where Haro fell, and AJR was acting as the agent and
property manager for Rogers with respect to the Building.  Thus, the plain language of this
endorsement applies and renders the Travelers Policy as excess over "other valid and collectible
insurance," here, the Benchmark Policy.  Benchmark's briefing does not address this
endorsement nor advance any arguments related to it, and Benchmark therefore has waived any
contention that the provision would not apply to render Travelers as excess.

4.  Benchmark's other arguments in reliance on the Lease agreement indemnification
provision are without merit.

Benchmark's only other argument in opposition to Travelers' position as to the priority of
coverage is that the terms of the Lease, including the indemnification provision, work to render
Benchmark's coverage excess as to Travelers' coverage.  (Dckt. #19 at 3-5).  As noted above, the
Lease includes an indemnification provision that Helget must generally indemnify and hold
harmless AJR for any claims or litigation arising out of any occurrence at the Building
occasioned by Helget's operations and use of the leased property, except that Helget is not

23

responsible for indemnifying AJR when the events underlying the claims or litigation were caused by AJR's own negligence. (*See* Dckt. #24 ¶6; Dckt. #1-2 at 29).

Benchmark notes that the Haro Complaint does not allege that any wrongdoing by his employer Helget caused or contributed to Haro's injuries, but rather that Haro claims that it was Rogers and AJR who were negligent in the maintenance of the property. (Dckt. #19 at 4-5). Indeed, Benchmark points out that it was AJR, not Helget, that was required under the Lease to keep the Building and surrounding premises in good condition (including snow removal). (*Id.*). Benchmark thus maintains that, under the terms of the Lease indemnification provision, Helget is not required to indemnify and hold harmless AJR for the Haro Lawsuit, because Haro's allegations arise from AJR's (and Rogers's) alleged negligence, and not any actions by Helget.

Nonetheless, regardless of whether the allegations of the Haro Complaint implicate the indemnification provisions of the Lease, Benchmark does not explain how this would have any bearing when it comes to interpreting the respective duties of Travelers and Benchmark *under the terms of the insurance policies*. Rather, Benchmark simply recites the relevant Lease provisions and declares in conclusory fashion that they somehow render Benchmark's coverage excess as to Travelers'. Once again, such a conclusory and underdeveloped argument could be dismissed out of hand as waived.

In any event, as Travelers correctly notes, a promise to indemnify a party, and a promise to secure insurance for a party, are two separate and distinct contractual promises. *See, e.g.*, *Hartford Cas. Ins. Co. v. Bd. of Educ. of City of Chi.*, 813 F.Supp.2d 942, 945 (N.D.Ill. 2011) (citing cases) ("Illinois law draws a sharp distinction between a promise to indemnify a party and a promise to name a party as an additional insured."). The two promises by Helget are thus separate and distinct, and not impacted by the requirements of one another, unless the language

24

of the Lease suggests otherwise.  But there is nothing in the language of the Lease suggesting

that the provision of insurance to AJR is conditioned, in the same way the indemnification

provision is, on AJR's negligence.  Instead, the promise that Helget will secure insurance states

that such insurance will cover AJR against "any and all liability whatsoever or howsoever

occasioned."  Helget's separate promise to indemnify AJR directly under some circumstances

has no bearing on this promise to secure liability insurance, as there is no language suggesting

that the indemnification provision modifies the conditions of the insurance that Helget is to

secure, or vice versa.  Furthermore, as Travelers notes, both the Benchmark and Travelers

policies contain integration clauses stating that the agreements represent "all of the agreements"

between the insurers and the insureds, meaning that the terms of the Lease agreement have no

bearing on the scope of coverage under the policies themselves.  Thus, whether the

indemnification provision is triggered by the Haro Complaint has no bearing on Helget's

promise to obtain liability insurance nor the priority of coverage under that policy.

In sum: Benchmark has failed to present any meritorious argument in opposition to

Travelers' position as to the priority of coverage.  Travelers is thus entitled to judgment as a

matter of law that the Benchmark Policy provides primary and noncontributory coverage to AJR

in relation to the Haro Lawsuit, and that Travelers provides excess-only coverage, meaning that

Travelers has no duty to defend or indemnify AJR in relation to the Haro Lawsuit until the

Benchmark Policy is exhausted.  Travelers' motion for judgment on the pleadings on Count I as

to its claim for a declaratory judgment, is therefore granted.

### C.  Benchmark's cross-motion for summary judgment is denied, and its counterclaim is dismissed.

Given that the Court holds, as a matter of law, that Travelers is entitled to a declaratory

judgment in its favor that the Travelers Policy is excess, and Travelers owes no duty to defend or

indemnify AJR until the Benchmark Policy is exhausted, Benchmark's counterclaim seeking the opposite relief necessarily fails. In other words, Benchmark is not entitled to judgment in its favor that its policy provides excess coverage for AJR, because as detailed above, the unambiguous language in the policies renders Benchmark primary and Travelers as excess. Benchmark's cross-motion for summary judgment is therefore denied. The Court's ruling also necessarily means that Benchmark's counterclaim seeking a declaration that it provides excess coverage only for AJR necessarily fails to state a plausible claim for relief as a matter of law, and therefore must be dismissed.

There is an additional issue with Benchmark's counterclaim that the Court must address, which is that Benchmark attempts to group both Rogers and AJR into its claim for declaratory relief. Specifically, Benchmark claims that Travelers provides primary coverage to *both* Rogers and AJR, while Benchmark provides only excess, and indicates that Benchmark is seeking a declaratory judgment as to the insurers' obligations for both parties in the Haro Lawsuit. (Dckt. #9 at 20, 25.)

The Court has already resolved the question as to AJR. As to Benchmark's attempts to rope Rogers into its counterclaim, its efforts to do so are improper. Rogers is not a party to this action and Travelers has not sought any declaration as to the priority of coverage for Rogers, nor is Travelers pursuing any remedies against Benchmark as the subrogee of Rogers. Article III of the Constitution limits the Court's authority to adjudicate only cases or controversies. This requirement is mirrored in the Declaratory Judgment Act, which only allows a court to declare legal rights in "a case of actual controversy." 28 U.S.C. §2201(a). There is nothing in the allegations of the Complaint, or in Benchmark's counterclaim, suggesting that Travelers has raised any dispute regarding the respective rights and duties as to coverage for Rogers in the

26

Haro Lawsuit, or that it is seeking reimbursement for any costs that may have been paid or may be incurred in the future. There is thus no controversy before the Court with respect to Rogers that would support the Court issuing any declaration of the parties' respective rights. Therefore, to the extent that Benchmark's counterclaim seeks any relief as to Rogers, that aspect of the counterclaim is dismissed for lack of subject matter jurisdiction. Travelers' motion to dismiss the counterclaim is therefore granted.[9]

> **D. Travelers is entitled to contractual subrogation for the defense costs it incurred, but its request for judgment in the amount of the costs it has incurred and will incur in the future is premature.**

Finally, the Court turns to Travelers' claims for equitable subrogation (Count II) and contractual subrogation (Count III) from Benchmark. It is undisputed that, despite the respective duties of the insurers, Benchmark has refused to provide AJR with a defense in the Haro Lawsuit, and that Travelers has been forced to do so and has incurred approximately $25,000.00 in costs defending in AJR in the Haro case as of the filing of the Complaint. Travelers asks the Court to enter judgment in its favor on its subrogation claims, and order that Benchmark is liable to Travelers for $25,000.00 in damages on "an interim basis" and is further liable for any additional defense or indemnity costs that it has incurred since the time the Complaint was filed, and may be further incurred by it in relation to the Haro case. (Dckt. #12 at 1).

Subrogation in the insurance context is the substitution of an insurer carrier in the place of its insured so that the insurer may recover payments made to its insured from another

---

[9] Even if there were a justiciable controversy as to Rogers, the Court would additionally find that Benchmark's counterclaim fails to state any plausible claim as to Rogers. While some of the pleadings vaguely suggest that Rogers is also insured by Travelers, Benchmark does not include any allegations to that effect in its counterclaim, nor does it point to relevant insurance policies that indicate where and how Rogers is insured. Rather, Benchmark's allegations refer only to the same agreements at issue with respect to AJR, but do not allege that those same agreements concern Rogers. The counterclaim is thus devoid of any allegations implicating coverage for Rogers or from which the Court could assess any priority of coverage.

responsible party. *See James River Ins. Co. v. Canal Ins. Co.*, 534 F.Supp.3d 962, 967 (N.D.Ill. 2021) (citations omitted); *see also N. Am. Ins. Co. v. Kemper Nat. Ins. Co.*, 481, 758 N.E.2d 856, 859 (Ill.App. 2001) (defining subrogation as a broad doctrine in which one "pays a debt for which another is primarily liable and in which equity and good conscience should have been discharged by the latter.").

Turning to the applicability of the subrogation clause in the Travelers Policy – and setting aside Benchmark's waiver of any arguments to the contrary – the Court finds that the policy provides for contractual subrogation as Travelers suggests. The Travelers Policy states that, if Travelers is only obligated to provide excess insurance, but no other insurer defends the insured (AJR), Travelers will do so but "will be entitled to the insured's rights against all those other insurers." (Dckt. #9 ¶38; Dckt. #1-4 at 30-31). The Travelers Policy separately provides that "[i]f any . . . organization . . . for whom we make payment . . . has rights to recover damages from another, those rights are transferred to us." (*Id.*). Because Benchmark owes a duty to defend AJR as a primary carrier in the Haro Lawsuit but has failed to do so, it has breached its duty to defend and is liable to AJR for its defense costs. As Travelers has already covered those defense costs, Travelers is subrogated to AJR's claims against Benchmark through operation of the provisions of the Travelers Policy quoted above. In short, Travelers is entitled to contractual subrogation of AJR's rights to recover defense costs from Benchmark.[10]

But while Travelers is correct on the merits of its contractual subrogation claim, that is

---

[10] As a general matter, "[i]nsurers may pursue equitable or contractual subrogation—the former is rooted in equitable principles, while the latter stems from the specific contractual terms of the policy." *James River Ins. Co.*, 543 F. Supp. 3d at 967 (citations omitted). Where, as here however, Travelers has asserted subrogation based on the terms of its policy, it may not also pursue equitable subrogation. *See Scottsdale Ins. Co. v. Knapp*, No. 13 C 988, 2015 WL 2012433, at *2 (N.D.Ill. Apr. 30, 2015) (citing *Am. Family Mut. Ins. Co. v. N. Heritage Builders, L.L.C.*, 937 N.E.2d 323, 327 (Ill.App. 2010) ("[C]ommon law or equitable subrogation cannot stand in the face of an express contractual right of subrogation."). Therefore, the Court denies Travelers' request for judgment on its claim for equitable subrogation.

not the end of the inquiry. The issue for Travelers is that this claim is not ripe for judgment at this time. It is well-settled that Illinois law does not allow for partial subrogation when the debt at issue has not been paid in full, even where there is a contractual subrogation provision. *See James River Ins. Co.*, 534 F.Supp.3d at 969 (citing *Labella Winnetka v. Gen. Cas. Ins. Co.*, 259 F.R.D. 143, 147 (N.D Ill. 2009)) ("Illinois courts follow the 'general rule . . . that partial subrogation will not be allowed where the debt has not been paid in full.'") (citations omitted); *Benge v. State Farm Mut. Auto. Ins. Co.*, 697 N.E.2d 914, 920 (Ill.App. 1998) ("Clearly, an insurance carrier may not exercise its right to subrogation until it has paid the insured's damages under the policy giving rise to the subrogation rights.") (citations omitted)). What this means is that an insurer is not allowed to recover from a third party for the *partial* payment of funds paid to the insured, but instead it must "wait until it has paid off its liability completely and extinguished the debt of the third party." *James River Ins. Co.*, 534 F.Supp.3d at 969 (denying claim for partial subrogation when James River sought to recover its defense costs incurred to date and its future payments towards the judgment).

As best as the Court can tell from the pleadings and the record before it, the facts with respect to Travelers' subrogation claim are indistinguishable from those in *James River*. Travelers has expended around $25,000.00 in costs on the defense of AJR in the Haro Lawsuit so far, it may have expended further costs in the time since the filing of the Complaint, and it may incur even more costs and/or indemnity payments in the future. (Dckt. #12 at 1). But critically, the Haro Lawsuit remains ongoing. Travelers has thus only made a partial payment of AJR's defense costs; in other words, it has not fully discharged or extinguished Benchmark's obligation to provide a defense. As the case is ongoing, there has also apparently been no judgment against AJR or settlement obligating it to make any payments to Haro, nor is there any suggestion that

29

Travelers has actually made any indemnity payments. Travelers' ability (and need) to subrogate for indemnity is therefore "future, contingent, and uncertain," which cannot support a judgment on its contractual subrogation claim for indemnity *now*. *See Providence Wash. Ins. Co. v. Am. Bridge Div. of U.S. Steel Corp.*, 558 N.E.2d 396, 397 (Ill.App. 1990).

In sum: given that Travelers has only partially satisfied the debt it seeks to subrogate, at least at the time of this order, the Court cannot grant Travelers judgment on its claims for contractual subrogation. Travelers' motion for judgment on the pleadings on its claim for contractual subrogation is therefore denied.

It is worth repeating that the Court does agree with Travelers' interpretation of the applicable policy provisions on the issue of subrogation. And again, the Court has ruled that Benchmark had a duty to defend and indemnify AJR as a primary carrier, which it has failed to do, and that Travelers provides only excess coverage and therefore does not have a duty to provide for defense and indemnity of AJR until Benchmark's policy is exhausted. What this means is that Travelers will be entitled to contractual subrogation once it has completely discharged the duty to defend and indemnify. The denial of Travelers' motion is therefore without prejudice to Travelers refiling its motion to assert its full claim for subrogation, if known, by April 30, 2024. *See James River Ins. Co.*, 534 F.Supp.3d at 973. If Travelers does not reassert its motion by that date, the case will be dismissed without prejudice and Travelers can file a new case when its subrogation claim becomes ripe. *Id.*

## CONCLUSION

For the foregoing reasons, Travelers' motion for judgment on the pleadings, (Dckt. #12), is granted in part, and the Court enters judgment in Travelers' favor on Count I of its Complaint seeking a declaratory judgment. The Court finds and declares that the Benchmark Policy issued

to Helget provides primary and noncontributory insurance to Travelers' Named Insured, AJR; that Benchmark owes AJR duties to defend and indemnify in the underlying Haro Lawsuit; and that the Travelers Policy provides excess insurance to AJR, with no duty to defend or indemnify AJR in the Haro Lawsuit unless and until the Benchmark Policy has been exhausted by the payment of settlements or judgment. Travelers' motion for judgment on the pleadings as to Count II for equitable subrogation is denied with prejudice. Travelers' motion for judgment on the pleadings as to Count III for contractual subrogation is denied without prejudice with leave to refile its motion to re-assert its full claim for subrogation, if known, by April 30, 2024. Failing that, the case will be dismissed without prejudice and Travelers can file a new case when its subrogation claim becomes ripe. Travelers' motion for judgment on the pleadings is denied with prejudice with respect to Travelers' claim for equitable subrogation (Count II). Benchmark's cross-motion for summary judgment, (Dckt. #17), is denied. Travelers' motion to dismiss Benchmark's counterclaim, (Dckt. #10), is granted.

**Date: February 23, 2024**

**Jeffrey I. Cummings**
**United States District Court Judge**

31